Filed 2/16/22  P. v. Johnson CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TODD LEE JOHNSON,<br><br>    Defendant and Appellant. | B308501<br><br>(Los Angeles County<br>Super. Ct. No. SA095426) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathryn A. Solorzano, Judge.  Affirmed.

Steven A. Brody, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Todd Johnson (Johnson) was convicted of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)). On appeal, Mr. Johnson contends that the trial court should have granted his motions for a mistrial and for a new trial after two witnesses mentioned he was on parole at the time of the charged offense. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Charges

After stabbing Shaina Brown (Brown), Mr. Johnson was charged with one count of assault with a deadly weapon. He was alleged to have suffered prior convictions for serious or violent felonies that subjected him to enhanced sentencing pursuant to the "Three Strikes" law (§§ 667, subds. (b)-(j), 1170.12, subds. (a)-(d)). Mr. Johnson was also alleged to have suffered prior convictions within the meaning of section 667, subdivision (a)(1) and former section 667.5, subdivision (b) (Stats. 2014, ch. 442, § 10.)

### II. Trial

#### A. *People's Case*

##### 1. Initial Witnesses

The People's first witness was Ms. Brown, who testified that on April 14, 2017, she was a homeless artist displaying her work and collecting donations near the Santa Monica Pier. That night, she noticed Mr. Johnson and Karisa Rivers (Rivers) nearby. As she moved to throw away some trash, Ms. Brown saw Mr. Johnson was standing alone and watching her. She

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

2

wondered where Mr. Johnson's female companion was, then sensed someone near her shoulder. Ms. Rivers was standing right next to her, grinning. Ms. Brown was startled and thought she was about to be robbed. Ms. Brown pushed Ms. Rivers away and asked what she was doing.

Ms. Rivers punched Ms. Brown with a closed fist. Ms. Brown, who was holding a plastic and steel bike lock with a cord that she had intended to throw in the trash, "swung back" at Ms. Rivers with the hand in which she was holding the cord. Ms. Brown made contact with Ms. Rivers's body. At some point early in the fight, Ms. Brown dropped the bike lock.

Ms. Brown testified that the fight lasted several minutes and involved more than 50 blows. Ms. Rivers hit Ms. Brown's face and chest with a closed fist, and also pulled Ms. Brown's hair. Ms. Brown struck back with closed fists and hit Ms. Rivers in the chest and face. Eventually, Ms. Brown held Ms. Rivers's neck and pushed her away.

Appellant attacked Ms. Brown from behind and hit her several times with his fists. The women fell to the ground. Ms. Brown, who wanted the fight to stop, ceased hitting Ms. Rivers and just held her. When Ms. Brown screamed for someone to call the police, appellant and Ms. Rivers fled.

As Ms. Brown quickly gathered her belongings so that she could leave the area, appellant and Ms. Rivers returned. Ms. Rivers was holding the bike cord. Ms. Rivers swung the bike cord at Ms. Brown, but Ms. Brown blocked it with her arm. The women fought again. Although Ms. Brown did not recall having anything in her hands during this second altercation, she may have held a stick, lever, or paint brush.

Appellant did not attempt to separate the women or stop the fight. Instead, he stabbed Ms. Brown in the left lower back. Ms. Brown felt warmth on her side and realized she was bleeding. She screamed she had been stabbed and someone should call the police. Appellant and Ms. Rivers ran away.

Ms. Brown was light-headed when the paramedics arrived, and she became extremely upset and frantic that she would not be able to take her possessions, particularly her phone and debit card, to the hospital. She did not recall telling a responding police officer who asked her what happened, "Nothing. I'm fine. Go away," but at the time she was "pretty out of it" and "losing a lot of blood." A police report stated that she told a police officer, "The lobsters are coming from the ocean to get me," but Ms. Brown denied making that statement and stated that if she did say that, she was delirious from being stabbed.

Ms. Brown testified she had been diagnosed with schizophrenia and depression, but these conditions did not interfere with her ability to perceive what happened the night of the incident.

Bystander Cheyenne Merced (Merced) testified she was leaving the Santa Monica Pier when she saw two women pulling on each other's clothes and pushing and swinging at each other. Neither woman had anything in her hands. Ms. Merced testified that appellant yelled at the women to stop and said, "Come with me. Come with me." The women continued to struggle.

According to Ms. Merced, appellant stepped away momentarily, then returned to the fighting women. He grabbed Ms. Rivers's arm and said, "Come on, let's go." The women separated and stepped back, and Ms. Brown began to adjust her hair and clothing. Appellant let go of Ms. Rivers, positioned

4

himself between the two women, and then stabbed Ms. Brown. At first, Ms. Merced thought he had punched Ms. Brown, but when he pulled back she saw he was holding a folding knife. Ms. Merced was shocked; she had not expected a weapon to be drawn in what was otherwise a minor fist fight.

After the stabbing, appellant and Ms. Rivers walked away. Ms. Merced stayed at the scene while her boyfriend ran to get help from a passing fire truck. Ms. Brown, who was dripping blood from her left side, began to gather her belongings and she accused bystanders of failing to help her. Ms. Merced told Ms. Brown they had called the police and help was on the way.

When fire personnel arrived, Ms. Brown was calm until she learned she would be transported to the hospital. She became agitated about leaving without her possessions. Ms. Merced testified Ms. Brown calmed down when the fire personnel allowed her to bring a bag with her. Ms. Merced went with police for a field show-up, and she identified appellant as the man who had stabbed Ms. Brown.

The third witness was Santa Monica Police Sergeant Tina Greer, who arrived at the scene of the stabbing as fire personnel tended to Ms. Brown. Ms. Brown was bleeding heavily through the medical dressing placed on her left side, and her hair was disheveled. Ms. Brown was upset and yelling, but Officer Greer could not make out what she was saying. Officer Greer began to search for witnesses to gather information for a crime broadcast.

Ms. Merced and her boyfriend Robert Griffin (Griffin) waved Officer Greer down and said they had seen what happened. Officer Greer directed other officers to speak with Ms. Merced and Mr. Griffin, and she returned to Ms. Brown to try to obtain information from her. Ms. Brown was still yelling and

bleeding heavily: The blood was "pouring down" to her sweat pants. Although Ms. Brown was upset, she was not physically combative.

Ms. Brown initially refused to be transported to the hospital. She relented when told she was losing a lot of blood. Ms. Brown got on the gurney and was taken to the hospital; Officer Greer brought two bags of Ms. Brown's possessions to her in the ambulance, then followed the ambulance to the hospital. At the hospital, Ms. Brown was uncooperative with the doctors who were trying to assess her injuries: she yelled and refused to answer questions, but she was not combative. Doctors administered ketamine and she went to sleep.

Officer Greer testified the doctors found Ms. Brown had suffered a one-inch linear laceration on her left flank that was six to eight centimeters deep, requiring surgery.

Officer Michael Ortiz, the fourth witness, testified he was on patrol on April 14, 2017, when he heard a radio call describing the man and woman involved in the stabbing. He and his partner stopped a couple matching the descriptions that had been broadcast. The man was appellant. They were identified in field show-ups and then arrested.

### 2. Parole References

The prosecutor asked Officer Ortiz what happened after appellant was identified in the field show-up. Officer Ortiz responded, "He was cooperative, you know. There wasn't anything out of the ordinary. We just waited patiently. He did everything we asked. Very kind. He admitted that he was on parole." Mr. Johnson objected, and the trial court sustained the objection, struck the testimony, and asked the jury to leave the courtroom.

6

The prosecutor told the court she had instructed the witness not to mention Mr. Johnson's status as a parolee, but Officer Ortiz denied being so directed. The court criticized the prosecutor for asking such an open-ended, overly broad question, and also faulted appellant for knowing that the police report mentioned his admission to being on parole but failing to move to exclude that information when he filed his many pretrial motions.

Appellant, who represented himself at trial, requested a mistrial. The court indicated it would consider the request, but rather than keep the jury waiting, it would continue with the trial and rule later.

When the jurors returned to the courtroom, the court said, "Ladies and gentlemen, the officer when testifying made a reference to parole, and I want you to entirely disregard that statement. [¶] Now, during jury selection I talked to you about compartmentalizing. So when you become a juror in a case you come in with life experience, a wide range of life experience, every one of you, and you know what the do's and don'ts are. [¶] This process requires a tremendous amount of restrain[t] on the part of a juror. Intellectual honesty and absolute commitment to the principles that apply in this case, constitutional princip[les] and procedure principles. [¶] I'm ordering you right now to absolutely disregard that reference and I would ask you if you are not capable of doing that to let me know. [¶] But, again, you know, it's not an impossible task. It is not an unreasonable question—I should say order—for this court to give you that order. [¶] And I really do expect an outcome in this trial which is based on the law and the reasonable and objective evaluation of the evidence in this case under the law. [¶] So, again, that reference has zero,

zero, relevance to what you are here for in this case now, which is to look at the facts that come to you, the evidence in this case, decide how much weight you wish to give that evidence—none, some, a great amount. It's up to you. [¶] You quantify the weight of the evidence and whether or not the People meet their burden in this case[,] which is proof beyond a reasonable doubt as to every essential element in this case. [¶] And what I'm saying to you is that reference is zero in that analysis. It is zero. And if you were to disobey my order, there will not be justice at the conclusion of this case. That's how strongly I feel about that. [¶] So think about what I just ordered you to do. And if you think intellectually you can't do that, just let me know. I have no problem with that. It is—there is no wrong answer. [¶] What would be wrong in terms of a just outcome in this case is for you to give any, any, weight or consideration to that in evaluating the evidence and reaching your verdict in this case. [¶] So I'll give you a few minutes to think about it. We can talk about it at the end of the day, whatever you like. But if you don't feel as strongly as I do that is entirely irrelevant, let me know."

Direct examination of Officer Ortiz resumed, followed by cross-examination. The next witness, Officer Ashley Allen, testified he had been called to the location where Officer Ortiz and his partner stopped appellant and Ms. Rivers. The prosecutor asked if Officer Allen searched appellant, and Officer Allen responded affirmatively. "And for what purpose?" asked the prosecutor.

"The suspect told me he was on parole—" Officer Allen began.

"Stop," the prosecutor ordered Officer Allen. Appellant objected.

The court said, "O[h] my God.  Okay.  [¶] Let me also remind you, ladies and gentlemen, that you absolutely have no idea what he was on parole for according to these officers.  You've got nothing.  You've got nothing."  The court told the officer not to refer to parole again.  Testimony resumed, but moments later the court interrupted Officer Allen's testimony so it could address the jury.

The court told the jury, "I'm going to just excuse you for the day in a few minutes.  I hope you've had enough time to think about what I'm going to say. [¶] If you change your mind after you state your position to me today, feel free at any point until this case is submitted to you as jurors, even when you are deliberating. [¶] If for some reason you make a statement to me now you can't stand by later, you can always correct me and we have four alternates here.  So we are stacked with jurors who can proceed in this case fairly. [¶] That reference, again, gratuitous, totally irrelevant, doesn't tell you anything about what he may or may not have been on parole for, nothing.  But just the thought of it, just the word of it as spoken in this context, if it's going to affect your verdict, let me know. [¶] I'm telling you don't let it.  Don't let it affect your verdict.  It is entirely irrelevant.  If you let it affect the verdict, this is not a fair fight.  It's not.  If that's what it impacted on you, then this is not a fair fight."

The court polled the jurors and alternate jurors individually, asking whether they understood the importance of this point, whether the mention of parole would affect their verdict, and whether they could put the information out of their minds.  Additionally, the court asked if the jurors thought it was

9

being reasonable in its response to the issue.[2]  The court acknowledged jurors might feel pressured to tell the court it was acting reasonably, but assured them that "really, if you think I'm unreasonable right now, that's okay.  Just let me know, because that's how offended I am by that word in this case."

All the jurors and alternates responded they would not consider the mention of parole in their deliberations.  In response to the court's question about reasonableness, Juror No. 12 said, "I think you are harsh and very opinionated by it, but I accept what you say."

"Because it's so entirely irrelevant," responded the court.  Juror No. 12 said he understood.

Juror No. 13 asked the court, "Why is it irrelevant if that's what he said while being arrested?"

The court answered, "Because the concept of someone being on parole raises questions potentially in someone's mind that aren't going to be answered because it's totally irrelevant.  [¶] Do you see what I'm saying?"

Juror No. 13 nodded affirmatively and told the court, "I'm following you."

After the polling of the jury concluded, Juror No. 1 asked, "The reason why it's such a big issue is because his past has nothing to do with what happens in this case?"

"That's right," said the court, and it excused the jurors for the day.

---

[2]     The court later explained to the parties, outside the presence of the jury, that it asked this question to "inspire a response from the juror" and "see if the juror has something to say about this."

Once the jury left, appellant renewed his request for a mistrial. He argued Juror No. 4 hesitated when questioned by the trial court, Juror No. 12 did not seem to appreciate the significance of the issue and faulted the court for being too harsh, and Juror No. 13 questioned why the evidence was not relevant. He expressed doubt he would receive a fair trial.

The court said while it did not intend to shift blame to appellant, he could have filed a motion in limine to make sure witnesses did not mention his parole status, as any trial attorney would have done. Appellant argued parole status was encompassed by his motion in limine concerning mention of his criminal arrest and conviction history, but the trial court disagreed. "[Y]ou went to sleep at the wheel," the court concluded.

The court also admonished the prosecutor, "[T]his is pretty basic. When you have witnesses you need to tell them in advance do not state this. You need to volunteer that even if the defendant is asleep at the wheel, because it's just a matter of justice. [¶] The reality is that you are—you get paid to do the right thing, not to win. You get paid to do the right thing, period. Whether you win or not, nobody cares. What happens is whether you have done a competent job, whether you do a competent job. Part of doing a competent job, frankly, is telling your witnesses don't testify to certain things."

The court agreed to excuse Jurors No. 4 and 13 and decided to inquire further with Juror No. 12 before deciding whether to excuse him. The court recessed for the day.

The following day, after reviewing the transcript of its questioning of the jurors, the court confirmed it would excuse Juror No. 4, whom the court described as "not instill[ing] in my

11

mind any sense of confidence with regard to her willingness to disregard that irrelevant reference." However, after its review, the court had concluded there was no good cause to excuse Juror Nos. 12 or 13, as neither juror gave any indication that the juror would engage in misconduct. Appellant questioned the court's conclusion with respect to Juror No. 12, and the court reminded him that Juror No. 12 had given a definitive negative response when the court asked if the parole reference would affect him.[3]

The court noted that if appellant elected to testify, he would be impeached with his prior felony convictions. "So the fact that they have learned that you were on parole at the time of your arrest, although it's entirely irrelevant and it could . . . call for the juror to speculate as to what you were on parole for, and they could view you as somebody who has a criminal record and therefore somebody who is—in this case may have a propensity to commit a crime, the reality is that they are going to hear that you have been convicted of offenses. They are going to hear that." The court also noted the jury would be instructed that the prior conviction information could be considered only in assessing appellant's credibility.

Although the court considered the two references to appellant's parole status "unfortunate," it did not believe that "in the greater scheme of things" the references to appellant's parole status, which the jury had been instructed to disregard, would deprive him of due process or a fair trial. "I don't believe that word or that knowledge as to your status at the time is going to do that [deny a fair trial] in terms of the whole picture here."

---

[3] Ultimately Juror No. 12 was excused before deliberations due to a scheduled vacation.

Appellant asked the court prohibit the prosecution from impeaching him with his priors as a sanction for the parole references, and the court refused.

The court excused Juror No. 4 and replaced her with an alternate juror. Officer Allen resumed his testimony.

### 3. Remaining Prosecution Evidence

Officer Allen testified he found no weapons when he searched appellant, but in appellant's backpack he found a multi-tool that contained a three-inch serrated blade and other tools. There did not appear to be blood on the multi-tool.

Upon his arrest, appellant refused to allow his photograph to be taken. Photographs taken of Ms. Rivers showed superficial scratches behind her left ear and on her neck, as well as a reddened nose and lips.

Dr. Catherine Lewis testified she treated Ms. Brown on April 14, 2017. Ms. Brown's stab wound to the lower left side was so close to her colon that surgery was required to determine if she had sustained internal injuries. Ultimately, she did not have injuries to the colon or other intrabdominal organs; Dr. Lewis controlled the bleeding and repaired the wound.

Detective Blake Cooper testified he briefly interviewed Ms. Brown in the intensive care unit after her surgery. Ms. Brown was calm, appeared to be under anesthesia, and seemed tired and in pain. She closed her eyes between questions and dozed off at times. She was, however, coherent in her responses to Detective Cooper's questions, and he did not have any concerns about her ability to perceive and recall events.

Detective Cooper testified Ms. Brown said she was cleaning up her things and preparing to leave the area when a man and woman approached her. Ms. Brown felt the woman's presence at

13

her shoulder and turned to see her standing very close to her. She asked the woman what she was doing, at which time the woman pushed her and they began to fight. During the fight the man hit her several times in the head and in the back. The initial fight ended and the man and woman walked away, but they returned. The woman ran at Ms. Brown, who picked up a "stick thing" and resumed fighting. As they fought, the man jumped in and stabbed her in her left side. Ms. Brown and the woman fought a short time longer, and then the man and woman walked away. Ms. Brown did not know why she had been attacked.

On cross-examination, appellant questioned Detective Cooper about inconsistencies between Ms. Brown's interview statements and her preliminary hearing and trial testimony. Detective Cooper considered the inconsistencies minor; they did not give him concerns about Ms. Brown's ability to accurately recall the specifics of the interaction with appellant and Ms. Rivers. Detective Cooper also testified that in January 2018 he contacted Ms. Brown to ask about her mental health history, and she disclosed a history of clinical depression arising from losing a child and becoming homeless. She said she was stable as of the date of the stabbing and she did not believe there was anything about her demeanor that would have caused her to be assaulted. In October 2018, Ms. Brown told Detective Cooper and a deputy district attorney her prior psychiatric hospitalizations were for depression and not schizophrenia.

Forensic scientist Greg Hogrebe testified that on the date of the stabbing he photographed a white purse with possible bloodstains on it and then photographed the scene of the stabbing to document possible bloodstains. He photographed a metal cable

with a loop on one end. He also retrieved and photographed a tank top with tears and possible bloodstains, and a stained sweatshirt.

B. *Defense Case*

1. Appellant's Testimony

On April 14, 2017, appellant and Ms. Rivers were walking when they saw Ms. Brown, whom appellant thought was high because she was acting wildly. Her hair was disheveled, her body was jerking, and she was looking up to the sky. She was "spaced out."

Appellant was walking away when he had a feeling he should turn around and look back. He saw Ms. Brown shoot Ms. Rivers a dirty look. Ms. Rivers turned around and approached Ms. Brown; appellant thought she was going to give Ms. Brown money. Ms. Brown tensed up and seemed angry.

Ms. Rivers "cring[ed] back" and told Ms. Brown to back away and get out of her face. Ms. Brown got closer to Ms. Rivers and repeatedly yelled, "What the fuck are you doing?" Ms. Brown got "too close" and the two women's chests bumped. Ms. Rivers pushed Ms. Brown away.

Neither appellant nor Ms. Rivers had done anything to provoke this but Ms. Brown, "like a magician," produced a cord of some kind and hit Ms. Rivers across the face with it. Because he is "very protective of family and friends, anyone," appellant swung at Ms. Brown; he missed. The two women began to fight. Appellant thought, "Whoa, these are two females fighting. Let me step back." Appellant did not get involved any further in the fight but encouraged Ms. Rivers to "kick her [Ms. Brown's] ass." He did not jump into the fight nor hit Ms. Brown in the back of

15

the head.  Instead, he picked up the items Ms. Rivers dropped in the course of the altercation.

Ms. Brown pulled Ms. Rivers toward her and they fell down.  Appellant "ran over there and I got between them and I, you know, physically just 'All right.  That's enough.'  And I broke them up."

Appellant and Ms. Rivers walked toward some bathrooms so she could straighten up, but because the bathrooms were closed they walked back in their original direction.  Ms. Rivers was walking quickly and angrily, and as she approached Ms. Brown, the women rushed at each other.  Appellant called out to warn Ms. Rivers that Ms. Brown had something in her hand.  The women began to fight again.  Appellant yelled at Ms. Rivers to stop fighting.

Ms. Brown overpowered Ms. Rivers and put her in a headlock, and it then looked to appellant like Ms. Brown stabbed Ms. Rivers's head twice with a shiny, 14-inch piece of tapered metal.  Appellant had "an out-of-body experience" and pulled out a folding knife.  Acting in defense of Ms. Rivers, he rushed in and stabbed Ms. Brown in the lower back.

Ms. Brown continued to fight.  She reminded appellant of "the Terminator" and "just kept coming"; "[t]here was nothing to do to stop her."  Although he knew Ms. Brown might stab him, appellant nonetheless "flung" himself between the women, blocked one of Ms. Brown's blows, grabbed Ms. Brown's arm, wrestled the piece of metal from Ms. Brown's hand, and threw it down in the street.

Appellant took Ms. Rivers's hand and they walked away.  He left the scene because of previous instances in which he had acted in self-defense or to protect others but the police had

charged him with crimes. Although he had been exonerated and the cases dismissed eventually, it had happened three or four times already and he believed the police would "make up a story that I somehow was aggressive when I was not."

Once they were away from Ms. Brown, appellant stopped and checked Ms. Rivers's head for injuries. There was no blood, which made appellant question what he had seen.

Appellant was detained by the police shortly thereafter. He did not tell the police at the time what had happened because he was accustomed to the police twisting his words. But the next day he thought he should "get my story out there, you know, and tell them what happened." He was interviewed by Detective Cooper on April 17, 2017.

Appellant was convicted in 2015 of a felony involving moral turpitude. He was convicted in 2010 of inflicting injury on a spouse or cohabitant (§ 273.5, subd. (a)). In 1994 he was convicted of robbery with a firearm (§ 212.5, subd. (b)), unlawful taking or driving of a vehicle (Veh. Code, § 10851), and a felony involving moral turpitude.

### 2. Search of Appellant

Appellant was searched by Officer Allen when he was detained. After he was arrested, the property taken from him in a booking search consisted of a broken cell phone, identification, lip balm, a wallet, two yellow metal earrings, a metal ring, three stud earrings, a belt and shoelaces.

### 3. Ms. Brown's Conduct Before Incident

On April 13, 2017, Ms. Brown became irate and uncooperative when asked by a public services officer to move from her location so that a city cleaning crew could clean the

area.  She was not cited for any criminal infraction and complied with the request to move.

### 4. Ms. Brown's Mental Health Issues

As of January 2016, more than one year before the stabbing, Paul Lopez worked as a licensed psychiatric technician ensuring that inmates with mental health issues were stable prior to their release from jail.  On January 21, 2016, he evaluated Ms. Brown and recommended she be placed on a mental health hold because she was gravely disabled, hostile, paranoid, and unable to formulate a viable plan for her aftercare.

Ms. Brown was admitted to the College Medical Center on January 22 or 23, 2016, with an admission diagnosis of paranoid schizophrenia.  Paranoid schizophrenia is a psychiatric condition characterized by psychotic symptoms, including paranoia, delusional thinking, and disorganized thinking.  It is a chronic mental condition that often can be managed by medication but is subject to flare-ups.  External stressors, such as a traumatic attack, can trigger a schizophrenic episode.  Patients with schizophrenia are likely to decompensate if not compliant with their medication regimen.

According to the report of psychiatrist Juden Valdez, on January 23, 2016, Ms. Brown was extremely hostile and paranoid, a poor historian, and extremely disorganized in her thinking.  She was paranoid with persecutory delusions.  Valdez prescribed an anti-psychotic medication and a mood stabilizer.  Ms. Brown was placed on a 14-day hold at the facility on January 24, 2016, because she could not formulate a plan for self-care.  She was, however, discharged three days later.  Patients are discharged before the hold period ends if they have stabilized,

demonstrate they can take care of themselves, and are no longer a threat to themselves or others.

On April 7, 2016, approximately one year before the stabbing, Ms. Brown had been admitted to Silver Lake Medical Center. Psychiatrist William Gillespie diagnosed her with schizophrenia, acute exacerbation, meaning that she was experiencing temporarily increased symptoms. She was discharged on April 12, 2016.

Chrystal Mataalii was working as a registered nurse in the emergency room when Ms. Brown was brought in for treatment on April 14, 2017. Although Nurse Mataalii did not remember treating Ms. Brown, she had recorded in her treatment notes that Ms. Brown had been crying and yelling, "I fucking hate this life. This is a fucked up ass life. Y'all are some evil fucking people. The most evil people I've ever met." Nurse Mataalii was present when Officer Greer attempted to question Ms. Brown. Nurse Mataalii wrote that Ms. Brown was responding to internal stimuli and that when asked who stabbed her, Ms. Brown said, "These fucking people you trained."

Registered nurse Sean Scott no longer remembered treating Ms. Brown on April 15, 2017, but his notes indicated he found her to be uncooperative to the point of requiring medication to calm her. According to his notes, Ms. Brown "appear[ed] to be talking in the third person and responding to internal stimuli, going in and out of the room, slamming doors, walking around the hallways naked, [and] bring verbally abusive to the staff."

Psychiatrist Wendi Benalt evaluated Ms. Brown on April 17, 2017, while she was hospitalized after the stabbing. As Dr. Benalt approached Ms. Brown's room, she heard Ms. Brown yelling obscenities at hospital staff. Ms. Brown was in restraints

19

in the hospital bed. Dr. Benalt introduced herself to Ms. Brown, who at first refused to make eye contact or engage in the interview and then began yelling accusations at Dr. Benalt and the treatment team. Ms. Brown said everyone was attacking her and Dr. Benalt was attacking her with her eyes. She said the nurse who put her in restraints was the person who had stabbed her, and she accused Dr. Benalt of conspiring with the nurse to harm patients. Ms. Brown was angry at the police for having her handbag, and Dr. Benalt found her to be fixated on this idea. She was uncooperative and argumentative, irritable, edgy, and intense. She was paranoid and possibly experiencing visual and tactile hallucinations. Ms. Brown's concentration and attention were impaired, as she was unable to appropriately answer most questions. Her insight was poor, as evidenced by her denial of being mentally ill. Her judgment was also poor, as evidenced by her non-compliance with medications and lab draws and her attempts to check out of the hospital without a viable plan for self-care. Dr. Benalt's diagnostic impression was that Ms. Brown was psychotic. In Dr. Benalt's opinion, as of April 17, 2017, Ms. Brown met the criteria to be held against her will.

Dr. Benalt had no way of knowing what Ms. Brown's state of mind was on the date of the assault, which took place three days before she interacted with Ms. Brown.

Psychiatrist John Brooks supervised a resident's consultation with Ms. Brown on April 21, 2017. In the notes from that interaction, Ms. Brown was described as being in a good mood but demonstrating poor judgment and exhibiting impulsive, reckless, aggressive and threatening behavior. Treatment with an antipsychotic medication was recommended.

The resident interviewed Ms. Brown again on April 24, 2017, while she was on a 72-hour psychiatric hold.  Dr. Brooks spoke with Ms. Brown and reviewed and supervised the resident's recommendations.  Dr. Brooks noted Ms. Brown lacked a cohesive train of thought, and her thoughts were paranoid but not homicidal or suicidal.  Her judgment was again described as poor due to impulsive, reckless, and aggressive or threatening behavior.  Ms. Brown was not able to answer questions appropriately.  Her insight was poor, as she was unable to or did not want to comply with treatment and inadequately understood her condition.  According to the notes of the interaction, Ms. Brown asked if "this rider is behind the camera that told the police to attack me," and described herself as "frazzled" because someone had stabbed her.  She said her staples were going to be removed that day and that she wanted to leave the hospital.  Ms. Brown's memory was intact, as evidenced by her ability to recall details of the interview and reporting events.

In September 2017, Ms. Brown was hospitalized and evaluated.  Psychiatrist Rick Jenkins described her presentation as "belligerent, dismissive, minimizing, disorganized, incoherent, confused, guarded, paranoid, vigilant, delusions of being injected with stuff and subjected to a computerized transgendered machine, loud, disruptive."  Her thought process was racing and disturbed, and she appeared to be hallucinating and delusional.  Her symptoms at that time would have interfered with her perceptions of reality.  Later notes indicated Ms. Brown had been a danger to others.

### 5.  Psychiatric Expert Testimony

Forensic psychiatrist John Stalberg opined that Ms. Brown was suffering from severe psychosis on the night of the stabbing.

He based this opinion on Ms. Brown's statement that lobsters were coming to get her, the police officers' description of her as unintelligible, her combative behavior in the ambulance, and the diagnosis of psychosis and the psychiatric hold when she was hospitalized after the stabbing.

A person with psychosis could react to a person smiling at him or her by "draw[ing] paranoid inferences and think[ing] something else is going on." An actively psychotic person's ability to perceive and understand is, by definition, very impaired, but it varies from patient to patient. People with schizophrenia can actually perceive and recall certain events; the only way to know whether they actually perceived an event is whether their account is corroborated by evidence.

Schizophrenia is the main psychosis in the world. It is marked by delusions, or fixed false beliefs, hallucinations, incoherent speech, and disorganized behavior. A person with paranoid schizophrenia attributes to others evil motives that do not actually exist. Some people with schizophrenia are permanently and constantly in a schizophrenic state, but most are not. Schizophrenic episodes may be triggered by an external stressor such as a physical attack or extensive external bleeding. A patient who was not taking medication would be negatively affected by stress.

C.    *Instructions, Verdict, and Sentence*

The jury was instructed with CALCRIM No. 222, which stated in part, "If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose."

22

The jury found appellant guilty, and the trial court found he had two prior strikes and the prior conviction allegations were true.

Appellant filed a motion for new trial, which was denied. The court struck one prior strike conviction in the interest of justice. Appellant was sentenced to eight years in state prison, consisting of the upper term of four years, doubled pursuant to the Three Strikes Law. The court declined to impose sentence on the remaining prior conviction enhancements.

## DISCUSSION

### I. Denial of Mistrial

Appellant argues the court should have granted his motion for a mistrial after two witnesses mentioned that he was on parole at the time of the charged offenses. " ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " ' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 298.) The defendant bears the burden to show the trial court abused its discretion in denying his motion for a mistrial. (*People v. Maury* (2003) 30 Cal.4th 342, 437.) We review a trial court's ruling on a motion for a mistrial under the deferential abuse of discretion standard. (*People v. Schultz* (2020) 10 Cal.5th 623, 673 (*Schultz*).)

Appellant's chances of receiving a fair trial were not irreparably damaged by the two references to parole. The statements were brief and nonspecific. They did not offer any detail about the nature of appellant's criminal history or prior convictions. A cursory and undetailed reference to a defendant's criminal history is not incurably prejudicial. (See *People v. Valdez* (2004) 32 Cal.4th 73, 128 [a "brief and isolated" statement by witness that he had interviewed defendant in jail did not warrant mistrial]; *People v. Franklin* (2016) 248 Cal.App.4th 938, 955 (*Franklin*) ["The California Supreme Court has consistently found vague and fleeting references to a defendant's past criminality to be curable by appropriate admonition to the jury"].)

The trial court, moreover, promptly and forcefully directed the jury to disregard the improper references to parole status. It adamantly impressed upon the jury the irrelevance of the fact that appellant was on parole, and it went to great lengths, both by addressing the jurors and by questioning them individually, to (1) ensure that they understood why the information had to be disregarded for appellant to receive a fair trial; (2) secure each juror's commitment that he or she would be able to follow its instructions to disregard the parole references; (3) and engage the jurors in discussion so their attitudes and demeanors could be more fully assessed. Indeed, when one juror stated she could follow the court's instructions but appellant identified some hesitation on her part, the court dismissed the juror. The trial court reasonably concluded its admonishments would ensure that the brief references to parole status did not irreparably damage appellant's chance of receiving a fair trial. Given the brevity of the two references and the court's extensive exploration of the issue with the jury, we find the trial court's admonitions to the

jury to disregard references to his parole status to be sufficient to cure any prejudice from the two statements. (See *People v. McNally* (2015) 236 Cal.App.4th 1419, 1428–1429 [prejudicial effect of inadmissible comments " 'may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured' "].) We presume a jury follows the court's admonishments. (*Schultz, supra*, 10 Cal.5th at p. 673.)

Appellant contends the court's curative actions only served to draw more attention to the improper evidence, and the court was unable to adequately assess the prejudicial impact of the two references to parole because the mistrial motion was made in the early stages of trial. But not only was the prosecution's case well underway at the time of the improper references to parole status, nothing in the record provides any reason to question the court's belief that any prejudice resulting from the improper evidence was cured by its prompt and explicit directives that the jury disregard it. Nor does the record disclose any reason for this court to cast aside the presumption that the jurors followed the court's admonishments. "[I]t is only in the 'exceptional case' that any prejudice from an improperly volunteered statement cannot be cured by appropriate admonition to the jury" (*Franklin, supra*, 248 Cal.App.4th at p. 955), and appellant has not demonstrated that this was such an exceptional case. We conclude the trial court did not abuse its discretion in denying the motion for a mistrial.

## II.   **Denial of Motion for New Trial**

Section 1181, subdivision 5, authorizes a convicted defendant to move for a new trial when the trial court has "erred in the decision of any question of law arising during the course of the trial." We review a ruling on a motion for new trial under the

25

abuse of discretion standard.  (*People v. Hoyt* (2020) 8 Cal.5th 892, 957.)  A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.  (*Ibid.*)

Appellant moved for a new trial on numerous grounds, one of which was the two references to parole.  In denying the motion for a new trial, the court commented, "I did very—very sternly admonish the prosecution for not having adequately spoken with her witnesses in advance and for not having adequately—telling them—having told them that they were not to mention his parole status.  I made it very clear to the jury that they were not to consider that.  The record is what it is with regard to that.  And in my opinion the reality is, is that Mr. Johnson testified in this case.  He was impeached in this case.  His impeachment with his felony convictions is far more, from my perspective, far more evidence of an actual conviction in the sense that they know what he was convicted of versus a basic statement about him being on parole, which doesn't indicate what he's on parole for and would call for speculation on the part of the jurors.  Had he not testified in this case, then the court's decision might have been different, but he did testify in this case and they did learn that he had been convicted of felony offenses. [¶] So the bottom line is, is that the record has been made with regard to that and I don't believe this court should grant a new trial based on the fact that those two witnesses mentioned his parole status."

Appellant argues a new trial should have been granted "[f]or much the same reason" that a mistrial should have been granted.  He asserts that once the evidence was received, the prejudicial impact of the references to his parole status had not

26

been mitigated; the prejudicial effect of the court's attempts to cure the error remained "undiluted"; and the jury's ability to accurately assess whether to believe appellant's testimony was "substantially impaired by the evidence showing that appellant was actively on parole at the time of the offense—a more damning fact than the fact of a prior conviction at some point in the past." He claims the victim's testimony was "ultimately discredited," resulting in the trial amounting to a decision whether to accept his version of events, and he states that it is "impossible to say" whether he would have chosen to testify were it not for the parole references.

The trial court did not abuse its discretion here. As we discussed thoroughly in the context of the mistrial motion, the trial court immediately struck the brief references to appellant's parole status, strongly admonished the jury to disregard that information, explained the reason the information could not be considered, questioned each juror about his or her ability to ignore the parole references, excused the one juror whose demeanor suggested she might find it difficult to follow the court's instructions to ignore the information, and gave CALCRIM No. 222, which instructed the jury not to consider any stricken testimony. Appellant has not established any reason to believe the jurors failed to follow the court's instructions.

Additionally, by the end of the trial, appellant had chosen to testify on his own behalf and he was impeached both by his prior convictions and on the substance of his testimony. The two brief references to parole, both of which the jury was told in no uncertain terms to disregard, were certainly no more prejudicial than the evidence he previously had been convicted of robbery with a firearm, unlawful taking or driving of a vehicle, and

27

inflicting injury on a spouse or cohabitant, and two sanitized felonies involving moral turpitude. Appellant pronounces the two references to parole as "more damning" than his actual priors because the jury was instructed the prior convictions could only be considered for impeachment; but by that reasoning, the fact that appellant was on parole would have no impact on deliberations because the jury was instructed that the parole references could not be considered for any purpose. Although apppellant suggests he might not have testified had the references to parole not been made, appellant represented himself before the trial court and could have personally explained his motivation for taking the stand if it had been relevant to the new trial motion—but he never claimed the two references to parole were the only reason he chose to testify.

Finally, the trial did not come down to a "discredited" victim's account versus appellant's account, as he argues. While there were inconsistencies in Ms. Brown's testimony, and she was shown to have mental health issues, her testimony was hardly discredited, and the trial was not merely a credibility contest between alleged victim and alleged attacker. A third party, Ms. Merced, testified that appellant stabbed Ms. Brown during a pause in the physical altercation, shockingly escalating the conflict from a garden-variety fistfight by jumping in with a knife. The trial court did not abuse its discretion in denying the motion for a new trial.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.